[643 NYS2d 148]

Mary Ann Stahl, Appellant, and Harvey B. Besunder, Respondent, v Youchan Rhee et al., Respondents.

Second Department, May 13, 1996

## APPEARANCES OF COUNSEL

*Leon Friedman* and *Sharyn Grobman,* New York City *(Baron & Vesel* of counsel), for appellant. (One brief filed.)

*Easton & Clark,* Levittown *(Alan W. Clark* of counsel), for respondent.

*Simpson, Thacher & Bartlett,* New York City *(George M. Newcombe* and *Lisa R. Paget* of counsel), for Sterling Winthrop, Inc., respondent.

*Kopff, Nardelli & Dopf,* New York City *(Martin B. Adams* and *Peter C. Kopff* of counsel), for Youchan Rhee and another, respondents.

## OPINION OF THE COURT

GOLDSTEIN, J.

At issue here is whether the trial court properly relieved the infant plaintiff's natural guardian, Mary Ann Stahl, and replaced her with an attorney, Harvey B. Besunder, as court-appointed guardian ad litem, for the purpose of approving a settlement of the infant plaintiff's claims. We hold that it did not.

The infant plaintiff was born on February 1, 1977. An Apgar score of nine was recorded one minute after birth and the optimal Apgar score of 10 was recorded five minutes after birth. Two weeks later, the infant was diagnosed as suffering from an infantile impetigo. His pediatrician prescribed pHisoHex, an antibacterial skin cleanser, to be rubbed into the blisters on the skin with each diaper change and then rinsed off. The infant's mother, Mary Ann Stahl, claims that within 48 hours after she started applying pHisoHex the baby became very irritable, with greenish stools and flaking skin. Mrs. Stahl used the entire 16-ounce bottle within nine days and thereafter renewed her prescription.

On March 1, 1977, the infant's pediatrician diagnosed the infant's condition as diaper rash, but Mrs. Stahl claims he urged her to continue the use of pHisoHex. The infant alleg-

edly continued to be irritable and have loose, foul-smelling, green-colored stool. Unusual body movements, such as twitching, stiffening, and staring were observed, and the baby was diagnosed with seizures on June 30, 1977.

At the age of one year, mental retardation was diagnosed, and institutionalization was recommended for the infant. Mrs. Stahl decided to care for the infant at home, attending to his needs and administering oxygen when necessary. By 1986, Mrs. Stahl was unable to provide the infant with the care he required, and he was placed in Cumberland Hospital in Virginia, one of few hospitals capable of tending to his needs. He was transferred to the Suffolk Child Development Center in 1989.

This action to recover damages for the infant's personal injuries, and asserting a derivative claim on behalf of his mother Mary Ann Stahl, was commenced in March 1984, and the trial commenced in March 1994.

At the time of trial, the infant was 17 years old, but functioned at the mental age of a child three and one-half years old. He required nursing care around the clock, as well as assistance in eating, dressing, and toileting, and will require such assistance for the remainder of his life. Although he is unable to speak, he has learned to communicate simple words with sign language, and has also learned to distinguish colors.

Prior to opening statements, Mary Ann Stahl's derivative claim was dismissed as time barred, and the appellant does not challenge that ruling, nor the order entered thereon, in her brief.

During jury selection, the defendants made several applications to preclude the admission of evidence. The trial court precluded the plaintiff's experts from mentioning a product used in France containing over 6% hexachlorophene, the active ingredient in pHisoHex, which resulted in the death of 36 children. The court also ruled that the plaintiff could not introduce evidence with regard to other lawsuits arising from an alleged exposure to pHisoHex, including a lawsuit brought on behalf of a plaintiff who is mentally retarded, allegedly as a result of exposure to pHisoHex.* The trial court also ruled irrelevant the effects of the product when used as a vaginal douche or tampon, to treat burns, as a lotion, or ingested orally. The plaintiff's counsel, after consultation with the court,

---

* That suit was dismissed by the New Jersey Superior Court but was thereafter settled for an undisclosed sum and the record sealed.

indicated that he would not seek to admit "adverse reaction reports" submitted to the Food and Drug Administration for the truth of the matter asserted, in view of the hearsay nature of these reports.

The plaintiff's expert witnesses, which included a board-certified pediatrician and graduate of Yale Medical School, a professor and former Chairman of Pharmacology and Toxicology at New Jersey Medical School, and a board-certified pediatrician and Director of Pediatric Oncology/Hematology at the National Medical Center in Duarte, California, relied upon numerous studies and reports, which established that hexachlorophene was a neurotoxic chemical, and further indicated that use of pHisoHex could result in seizures. The defendants' expert, Dr. Robert Shuman, contended that, while pHisoHex can have neurotoxic effects, including seizures and death, a person who survives "will fully recover, with the possible exception of optic nerve impairment", caused by edema resulting from hexachlorophene exposure. However, in a prior order dated June 16, 1993, the Supreme Court, Suffolk County (Cannavo, J.), ruled that "even if there are no previously reported issues of retardation or seizures following pHisoHex treatment, it does not follow that none have existed or can exist".

Prior to the defendants' opening statements, the plaintiff's counsel asked the court to rule inadmissible any evidence regarding that of the infant plaintiff's second cousins, one of whom suffers from mental retardation and a seizure disorder, the other of whom suffers from a seizure disorder. That application was denied. However, the plaintiff was prepared to submit evidence that the infant does not suffer from any congenital or hereditary illness.

The plaintiff's counsel noted that he explored the possibility of settlement "based upon the trial court's rulings and unequivocal statements that it would be very difficult for the plaintiff to establish a prima facie case". The trial court initially indicated it would not assist in negotiating a settlement because, in light of its rulings, it would be accused of coercing a settlement if it did so.

On March 29, 1994, the trial court informed the plaintiff's counsel that the pharmaceutical company defendants were offering $500,000 in settlement of all claims, which amount could be increased to $550,000. The plaintiff's attorney advised Mrs. Stahl to accept the settlement. Mrs. Stahl initially offered to accept $575,000 conditioned upon the waiver by the County of Suffolk of its medical bills, and the establishment of a special

needs trust. The plaintiff's counsel calculated that the proposed settlement would net the infant plaintiff about $300,000, which would be placed into a special needs trust.

Mrs. Stahl was ill in the hospital the following day, March 30, 1994, and was unable to appear. The court directed the plaintiff's counsel to inform Mrs. Stahl that if she could not appear, the court would consider appointing a guardian ad litem. That afternoon, Mrs. Stahl informed counsel that she no longer wished to accept the settlement.

When Mrs. Stahl appeared in court the following day, March 31, 1994, the court informed her that he was about to replace her with a guardian ad litem, because there was "some question with regard to a possible conflict of interest or that the child's interests are not being properly regarded as a matter of law", because she had no legal training and could not "make a proper judgment where litigation is involved".

After further colloquy, it was revealed that the plaintiff's counsel had incurred expenses of $100,000 on the case, for which Mrs. Stahl was financially unable to reimburse him. However, Mrs. Stahl said she could not accept the proposed settlement "under any circumstances" because it would not cover her son's expenses.

Thereafter, the court noted that the infant plaintiff was a great burden on Mrs. Stahl, since he could not do anything for himself. Mrs. Stahl claimed that the infant plaintiff's expenses "far exceed on a yearly basis what they have proposed to give" him. She further objected to a condition of the settlement that she "could not discuss this matter with anybody" if she agreed to the proposed settlement, and stated that, if the file were not sealed, she would have an opportunity to write a book, and use whatever proceeds might be generated for her son's care "being that the settlement is so small".

The court stated that "there are some very serious problems with the plaintiff's case. And rather than allow the child to take a chance * * * I am concerned enough to appoint a guardian ad litem". However, the court noted that if the settlement were approved, the court would ask Mrs. Stahl to go to the Surrogate's Court to apply for letters of guardianship over the infant, who would remain incompetent for the rest of his life, because "[s]he's obviously a good mother in the sense that she's looking after the child". The trial court further noted "who better than that to safeguard the child's fund and to be accountable to the Surrogate".

The guardian ad litem concluded that, if the trial proceeded, the case could be dismissed for failure to make out a prima

facie case; therefore, "it is clearly in the best interest of the child to accept the offered settlement". The order appealed from, entered May 3, 1994, approved the settlement.

The defendants rely upon precedent decided under the former Rules of Civil Practice which stated that it was not the intent of the rulemakers to grant a guardian ad litem the power to veto a proposed settlement (see, Lee v Gucker, 16 Misc 2d 346, revd on other grounds 27 AD2d 722). However, with the enactment of CPLR 1208 (a) (5), an application to settle an infant's action or claim had to include "an affidavit of the infant's parent or guardian stating approval of the settlement" (Speights v MVAIC, 75 Misc 2d 937, 938-939; see, Smith v Ford Motor Co., 38 AD2d 852).

CPLR 1201 provides, in pertinent part: "Unless the court appoints a guardian ad litem, an infant shall appear by the guardian of his property or, if there is no such guardian, by a parent having legal custody".

In that provision, the Legislature demonstrated a preference for natural guardians (see, Matter of Beyer, 21 AD2d 152, 154; Matter of Manufacturers Hanover Trust Co., 83 AD2d 808; Trippe v Trippe, 35 AD2d 944; Matter of Thoms, 33 AD2d 990; Matter of Pugach, 29 AD2d 518, affd 23 NY2d 901; Matter of Legget, 25 AD2d 727; United States v Noble, 269 F Supp 814). As the Appellate Division, First Department, noted in Matter of Manufacturers Hanover Trust Co. (83 AD2d 808, supra), "[i]t is the policy of this State to encourage parents to act as guardians, thereby avoiding unnecessary appointments and the expense of a guardian ad litem" (see, United States v Noble, supra).

The relieving of a guardian is a "drastic procedure" which may be accomplished in the court's discretion (Dicupe v City of New York, 124 AD2d 542, 544), but only upon a record sufficient "to permit an informed conclusion concerning the wisdom of the decision" (Lee v Gucker, 27 AD2d 722, supra). A parent may be removed as natural guardian if he or she has an interest adverse to the infant (see, Matter of Manufacturers Hanover Trust Co., 83 AD2d 808, supra), or if the infant's natural guardians have irreconcilable differences with each other (see, Mullins v Saul, 130 AD2d 634). There is absolutely no evidence that such factors exist in the present action.

The court cannot remove a guardian solely to ensure approval of a settlement (see, Sutherland v City of New York, 107 AD2d 568, affd 66 NY2d 800; Smith v Ford Motor Co., supra), since the power of the court to approve a settlement does not

confer a concomitant power to dictate the terms of the settlement (see, Reed v Tompkins Terrace, 209 AD2d 595, 597). In De Forte v Liggett & Myers Tobacco Co. (42 Misc 2d 721, 722), the court overrode the wishes of the infant's natural guardians, but only upon findings that the parents' refusal to consent to a settlement was "unreasonable, arbitrary and capricious and can only result in prejudice to the rights of the infant plaintiff".

In the instant case, Mrs. Stahl's refusal to accept the settlement offered was based upon an informed judgment that there was such a pronounced difference between the amount offered and her child's yearly and lifetime expenses, that the settlement would make no discernible difference in the child's life. The infant plaintiff, with a mental age of three and one-half years, will remain incompetent for life, requiring 24-hour nursing care and continuous help in eating, dressing, and toileting. His special damages, if he were to live at home rather than in an institutional setting, are estimated at over $8,000,000.

In the colloquy which led to the relieving of Mrs. Stahl as guardian ad litem, and in the report of the court-appointed guardian ad litem, there was no indication of the manner in which the amount awarded will meet the infant plaintiff's special needs, nor was there any meaningful discussion of what those special needs were. The court-appointed guardian ad litem, in his amended report dated April 7, 1994, states merely that "[i]t is uncontroverted that a supplemental needs trust will provide for Timothy Stahl those necessities, comforts and luxuries that State and Federal government programs do not provide".

The defendants have intimated that a conflict of interest existed between the infant plaintiff and Mrs. Stahl because she objected to the confidentiality condition of the settlement, and further stated that if the file were not sealed, she would have the opportunity to write a book. Mrs. Stahl also noted that if she wrote a book, she would use the proceeds solely for her son's care. Thus, personal financial gain was not her objective. Further, the trial court implicitly acknowledged that there was no conflict of interest between Mrs. Stahl and her son when he recommended that she be appointed permanent guardian for the purpose of administering the special needs trust.

The defendants also assert, in support of their conflict-of-interest contention, that Mrs. Stahl was engaged in what they characterize as a "crusade" or "trial by press" in the media

rather than pursuing her son's rights in court. Her efforts in this regard, however, must be viewed, at least in part, to her reasonable perception that her son's court case had been lost.

It is the position of the mother that the only thing that will change this infant's life will be to be cared for at home in a loving environment. She argues that $300,000 in the bank will in no way benefit this manifestly retarded infant, who will never utilize or in any way enjoy or realize this sum.

In a case where reasonable minds may legitimately differ, the judgment of the infant's natural guardian should prevail. It cannot be said that Mrs. Stahl's judgment in this matter was unreasonable, arbitrary, or capricious (see, De Forte v Liggett & Myers Tobacco Co., 42 Misc 2d 721, 722, supra). Indeed it is she who has loved, cared for, and sacrificed her life for her son, and who continues to argue his cause.

Accordingly, the order entered April 6, 1994, relieving the mother as guardian ad litem for the infant, and the order entered May 3, 1994, approving the settlement, are reversed, the motion for approval of the settlement is denied, and Mrs. Stahl is reinstated as guardian for her son.

The appeal from the order dated April 5, 1994, which dismissed Mrs. Stahl's derivative claims as time barred, is dismissed as abandoned. Although the plaintiff purportedly appeals from a transcript of a decision dated March 23, 1994, leave to appeal from this paper was denied by decision and order on motion of this Court dated April 14, 1994.

THOMPSON, J. (dissenting). In my view, the Supreme Court permissibly exercised its discretion in appointing a guardian ad litem for the limited purpose of considering the settlement offered by the defendant Sterling Winthrop, Inc. Accordingly, I dissent.

Mary Ann Stahl, the mother of the infant plaintiff Timothy Stahl, commenced this action alleging that the permanent seizure disorder and mental retardation which afflicted Timothy were caused by his use of pHisoHex during the first few months of his life. PHisoHex is an antibacterial skin cleanser which was introduced in 1949, and which has as its active ingredient hexachlorophene in a 3% concentration. Shortly after Timothy was born he developed a minor case of infantile impetigo for which pHisoHex washings were prescribed by the defendant Youchan Rhee. According to her interrogatory responses and the prelitigation medical histories,

Mrs. Stahl used pHisoHex until mid-March of 1977, although she later claimed that she continued its use until mid-April of 1977. The medical histories reveal that the first reported seizure occurred on June 30, 1977. Timothy was later hospitalized and subsequently diagnosed as suffering from a permanent seizure disorder accompanied by severe mental retardation of unknown etiology.

Approximately seven years later, Mrs. Stahl, a layperson with no medical training, concluded upon reading the Physicians' Desk Reference that pHisoHex was the cause of her son's medical problems. None of the physicians who had treated Timothy during this period had ever suggested that pHisoHex was the cause of Timothy's seizures and his retardation. Notably, the contemporaneous medical histories provided by Mrs. Stahl prior to the commencement of suit described Timothy as an essentially normal infant—until he had his first recorded seizure in late June of 1977, approximately $2^1/_2$ months after the last time Mrs. Stahl used pHisoHex. However, after commencing the lawsuit Mrs. Stahl began to claim that within 24 to 48 hours after washing her son with pHisoHex, he experienced seizures and unconsciousness and that this occurred 10 to 15 times per day whenever she changed his diaper and washed him with pHisoHex. None of these frightening symptoms was recorded anywhere in medical histories during the roughly seven-year period prior to the filing of this action.

Just prior to the commencement of trial, the court issued a series of evidentiary rulings which were highly unfavorable to the plaintiff. Specifically, the court precluded the plaintiff from introducing into evidence (1) any of the studies upon which her medical experts had relied in opposing a prior motion for summary judgment, and (2) any reference to the so-called "Talc Morhange" incident upon which the plaintiff's experts, in part, relied. The "Talc Morhange" incident occurred when French children were exposed not to pHisoHex but to Talc Morhange powder, which contained hexachlorophene in a 6.5% concentration, and which resulted in a number of deaths and injuries in France. Notably, none of the afflicted children developed permanent seizure disorders or mental retardation. The court further denied the plaintiff's motion to preclude the defendants from admitting into evidence proof that one of the relatives of the infant plaintiff suffered from similar conditions with which he was afflicted and that another relative was mentally retarded.

Although Mrs. Stahl intended to rely on the testimony of three medical experts—one of whom was not a medical doc-

tor—to buttress her claim, the record suggests that none of these experts was in a position to offer a medically authoritative opinion relative to the claim that pHisoHex was the proximate cause of Timothy's medical condition. One expert was neither a neurologist nor an expert on pHisoHex and conceded that his theories were "distinctly different from the mainstream". Two of the other experts relied on by Mrs. Stahl had offered opinions in a New Jersey case involving similar claims based on pHisoHex use. The New Jersey court rejected these opinions and those of certain other experts, observing, *inter alia,* that their conclusions purportedly linking pHisoHex to mental retardation were not generally accepted in the relevant medical community and were not based on reliable scientific methodology. In fact, a review of the materials submitted by the plaintiff's experts herein reveals that none of the experts could cite to a single case in the medical literature in which mental retardation or permanent seizure disorders were caused by exposure to pHisoHex.

In contrast, the defendants were prepared to introduce, *inter alia,* the testimony of several pediatric neurologists involved with the treatment of children with mental retardation and seizure disorders. Dr. Robert Shuman, a pediatric neurologist and neuropathologist who had done extensive research and writing on the effects of hexachlorophene, concluded that there had never been a reported instance of pHisoHex producing either of the conditions with which Timothy was afflicted within the 45-year history of the product. Dr. Schuman recounted that while high doses of hexachlorophene might affect the white matter of the brain, albeit in a reversible fashion, it would not effect the gray matter comprising the nerve cells. According to Dr. Schuman, the only arguable case of permanent sequelae in a survivor of pHisoHex toxicity that has ever been reported in the medical literature was an impairment to the optic nerve of one person who ate pHisoHex for 11 months.

After opening statements, during which the defense counsel apprised the jury of the stark contrast between the prelitigation medical histories provided by Mrs. Stahl and those she had given after the lawsuit was commenced, settlement negotiations were initiated upon the request of the plaintiff's counsel. After extensive negotiations were conducted, the defendant pharmaceutical company, Sterling Winthrop, Inc., offered a settlement in the amount of $575,000. The terms and conditions of the settlement were to be discussed further by the parties in chambers the next day. The plaintiff's counsel, who had

prepared the case for trial and served as counsel for the infant plaintiff from the inception of the lawsuit 10 years earlier, concluded that the settlement was in Timothy's best interests.

Although Mrs. Stahl originally had indicated her willingness to accept the offer, she did not appear in court the next day. Her attorney did not know where she was or why she had not appeared. Subsequently, Mrs. Stahl appeared and revealed in chambers that, without consulting her attorney, she had changed her mind about settling.

In order to ascertain why Mrs. Stahl had changed her mind, her attorney examined her under oath. Mrs. Stahl stated she no longer wanted to settle because the settlement was not large enough and because, *inter alia,* she knew in her "heart of hearts" that pHisoHex had caused not only her son's condition but "many other conditions in other children" and that if she were deprived of the opportunity to take her case to trial, other children would be injured. Mrs. Stahl also objected to a confidentiality provision in the proposed settlement agreement because it would interfere with her plan to write a book about the lawsuit. Mrs. Stahl further commented that, "I know that children are being injured and therefore I would need to have an open file on this. My child is damaged for life. That means a child born today or two weeks from today who gets impetigo who has to use this product will be damaged". She also stated, as recounted by her attorney, that even if her experts were not permitted to testify, she could herself testify as to how pHiso-Hex caused Timothy's condition based on the personal knowledge she had acquired during the course of the lawsuit. During the defense counsel's attempt to examine her concerning the settlement offer, Mrs. Stahl insisted that conducting the proceedings in chambers was a violation of her constitutional rights and that the individuals in the gallery—some present at her invitation—"want to hear what's being stated in this courtroom". When the court explained that he did not intend to conduct the proceedings in open court but would ensure that they were transcribed, Mrs. Stahl got up and stormed out of the room, refusing to answer any questions posed by the defense counsel.

After observing Mrs. Stahl's conduct, the court exercised its discretion under CPLR 1202 and appointed a guardian ad litem to ensure that Timothy's best interests were considered in connection with the settlement offer. Upon reviewing the settlement and the history of the case, the guardian, then-Suffolk County Bar President Harvey B. Besunder, submitted a report

to the court concluding that the settlement was in Timothy's best interests. In his report, the guardian observed, *inter alia,* that (1) the plaintiff's counsel had informed him that based on the court's rulings, there was an absence of sufficient case histories and medical records to connect the use of pHisoHex to Timothy's condition, (2) the medical affidavits, as well as the deposition testimony of both the plaintiff's and the defendants' medical experts made it clear that there was no medical literature, and in fact, no admissible case history which even suggested that the use of pHisoHex could have resulted in mental retardation or permanent seizure disorders, (3) that although pHisoHex has been on the market for 45 years, there was no empirical data supporting a theory connecting its use to the type of injuries sustained by Timothy, and (4) to the extent any adverse effect has been attributed to pHisoHex use, that effect was contemporaneous to the application. The guardian further observed that although Mrs. Stahl claimed to have made reports of contemporaneously occurring side effects— asserting that the doctors simply did not record them—none of those side effects was ever noted in Timothy's prelitigation histories.

Upon further negotiations, the guardian and counsel for all parties executed a written settlement agreement and the court subsequently issued an order approving the settlement. Mrs. Stahl now appeals. I would affirm.

Where an action has been brought on behalf of an infant, the court may replace the infant's guardian with a guardian ad litem if it is of the belief that the natural guardian was not acting in the best interest of the child (*see,* CPLR 1202; *Mullins v Saul,* 130 AD2d 634; *Dicupe v City of New York,* 124 AD2d 542). In my view, the court permissibly exercised its discretion in concluding that by rejecting the settlement offer, Mrs. Stahl was not acting in Timothy's best interests.

In this respect, the record supports the inference that irrespective of what the technical rules of evidence might require, or what the scientific evidence might reasonably be construed to support, Mrs. Stahl was intractable in her conviction that pHisoHex was the sole and only cause of her son's affliction. Further, it is apparent that Mrs. Stahl perceived herself as the person through whom the purported evils of pHisoHex could be trumpeted. In fact, her statements support the inference that, because of the medical establishment's perceived indifference to her theory, she was even more intent upon pursuing the lawsuit—irrespective of its chances for success—in order to

ensure that other infants did not suffer the same fate her son did. As she herself put it, "[m]y child is damaged for life. That means a child born today or two weeks from today who gets impetigo who has to use this product will be damaged". Indeed, she had already informed the court in no uncertain terms that she "would need to have an open file on this [case]".

Acting upon these convictions, Mrs. Stahl disregarded her counsel's advice and declined to accept the settlement notwithstanding (1) the absence of a single, documented case demonstrating that pHisoHex had ever caused conditions such as those suffered by Timothy (cf., Kracker v Spartan Chem. Co., 183 AD2d 810), (2) the existence of a persuasive, alternate etiology of Timothy's conditions, and (3) the court's evidentiary rulings which effectively undermined her ability to present a prima facie case. Mrs. Stahl's statements and conduct suggest that she was unreceptive to the advice of her counsel, and unwilling to consider the factors relevant to any realistic assessment of her prospects for success at trial.

The majority stresses the severity of Timothy's injury and concludes that Mrs. Stahl's refusal to accept the settlement offer was necessarily based upon an informed judgment that the settlement was small in comparison to expenses involved in his care. There is no dispute that Timothy's illness is severe and that the costs associated with his care are high. However, the fact that a person has become afflicted with a serious or costly malady does not establish that he or she is entitled to a recovery, that his or her legal theory is a reasonable one, or, more pertinently, that a guardian has acted appropriately by rejecting a settlement. The pertinent issues here relate to Mrs. Stahl's inability—or disinclination—to comprehend and consider the hard scientific and evidentiary facts relevant to the proof of her case, and whether, in light of those facts, there was a realistic likelihood of securing any recovery at all. The record does not support the majority's conclusion that Mrs. Stahl's judgment was informed in connection with these key issues.

Under these circumstances, the Supreme Court did not improvidently exercise its discretion in removing Mrs. Stahl as the guardian of the infant for the purpose of making a decision as to the settlement order, appointing Harvey B. Besunder as the infant's guardian ad litem for that purpose and in approving a compromise order. Nor under these circumstances, where Mr. Besunder performed a comprehensive, independent review of the matter, may it be said that the court improperly dictated the settlement (see, Cohen v Reed, 120 AD2d 480).

MILLER, J. P., and HART, J., concur with GOLDSTEIN, J.; THOMPSON and SULLIVAN, JJ., dissent in a separate opinion by THOMPSON, J.

Ordered that the appeal from the order dated April 5, 1994 is dismissed as abandoned; and it is further,

Ordered that the order dated April 6, 1994 is reversed, on the law and as a matter of discretion, and Mrs. Stahl is reinstated as guardian for her son; and it is further,

Ordered that the order entered May 3, 1994 is reversed, on the law and as a matter of discretion, and the motion for approval of the settlement is denied; and it is further,

Ordered that the matter is remitted to the Supreme Court, Suffolk County, for further proceedings; and it is further,

Ordered that Mary Ann Stahl is awarded one bill of costs, payable by the defendants appearing separately and filing separate briefs.